IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MITUTOYO CORPORATION, )
MITUTOYO AMERICA CORP. and )
HEXAGON METROLOGY )
NORDIC AB, )
   )
        Plaintiffs, )
   )
    v. )   No. 03 C 0990
   )
CENTRAL PURCHASING, LLC., )
   )
        Defendant. )

### MEMORANDUM OPINION

SAMUEL DER-YEGHIAYAN, District Judge

    This matter is before the court on Plaintiff Mitutoyo Corporation's ("Mitutoyo") and Plaintiff Mitutoyo America Corporation's ("MAC") motion for damages. For the reasons stated below, we grant in part and deny in part Mitutoyo's request for damages and deny MAC's request for damages.

## BACKGROUND

Plaintiffs Mitutoyo, MAC, and Hexagon Metrology Nordic AB's ("Hexagon") (collectively "Plaintiffs") brought the instant patent infringement suit against Defendant Central Purchasing, LLC. ("Central") over U.S. Patent No. 4,743,902 ("'902 Patent"). The '902 Patent covers "[a] system for measuring the relative movement of one object with respect to another, such as the movement of a slide with respect to a scale of a measuring instrument utilizes the capacitative effect of a series of electrodes associated with a slide and another series of electrodes associated with the cooperating scale, the changes in capacity caused by relative movement between the two members being analyzed by an electronic circuit." U.S. Patent No. 4,743,902 (issued May 10, 1988).

The controversy between the parties began in 1992, when Mitutoyo placed Central on notice that Central had allegedly infringed the '902 Patent through Central's sale of digital calipers that were manufactured by a company called Norwood ("Norwood Calipers"). After negotiations in 1994, Central agreed by contract that it would cease its sales of the Norwood Calipers. In 1995, however, Central brought an action seeking a declaratory judgment that the '902 Patent was invalid and thus unenforceable. Mitutoyo prevailed, and the '902 patent remains valid.

In May 2002, Central began selling digital calipers manufactured by a different company, Guanglu Measuring Instrument Co., Ltd ("Accused Calipers").

2

Plaintiffs brought the instant action, alleging that the sale of the Accused Calipers infringes the '902 Patent and that Central breached its 1994 contract with Mitutoyo. On March 30, 2004, we granted Plaintiffs' motion for summary judgment on the issue of patent validity. On October 27, 2004, the parties participated in a *Markman* hearing in this court in accordance with *Markman v. Westview Instrs., Inc.,* 52 F.3d 967, 979 (Fed. Cir. 1995). On March 3, 2005, we entered claim constructions based on that *Markman* hearing and on *Markman* memoranda filed by each party. Each party subsequently submitted motions for summary judgment, based on our constructions of the claim.

On April 20, 2005, we granted Plaintiffs' motion for summary judgment on the issues of patent infringement and breach of contract. Mitutoyo and MAC now seek lost profits of $11,260,103 and a reasonable royalty of 29.2% from Central, stemming from Central's infringement of the '902 patent. Hexagon is not seeking damages.

## LEGAL STANDARD

Damages for patent infringement are governed by 35 U.S.C. § 284 ("Section 284"), which, according to the Federal Circuit, is intended to "ensure that the patent owner would in fact receive full compensation for 'any damages' he suffered as a result of the infringement." *SmithKline Diagnostics, Inc. v. Helena Laboratories Corp.*, 926 F.2d 1161, 1164 (Fed. Cir. 1991)(quoting *General Motors Corp. v. Devex*

*Corp.,* 461 U.S. 648, 654-55 (1983)). The appropriate amount of damages is a factual determination, for which "the plaintiff bears the burden of proof by a preponderance of the evidence." *Smithkline Diagnostics, Inc.*, 926 F.2d at 1164; *Transclean Corp. v. Bridgewood Servs., Inc.*, 290 F.3d 1364, 1370 (Fed. Cir. 2002).

A court may divide damages between lost profits, "to the extent they are proven" by the plaintiff, "and a reasonable royalty for the remainder." *State Indus., Inc. v. Mor-Flo Industries, Inc.*, 883 F.2d 1573, 1577 (Fed. Cir. 1989). Lost profits are the profits that a patentee would have enjoyed "but-for" the infringement by the defendant. *Micro Chemical, Inc. v. Lextron, Inc.*, 318 F.3d 1119, 1122 (Fed. Cir. 2003). Once the patentee has shown that an inference of "but for" causation is reasonable, "the burden shifts to the infringer to show that the inference is unreasonable for some or all of the lost profits." *Id*. While there are multiple ways to satisfy this "but-for" test for causation, the most common method, and the method utilized by Mitutoyo and MAC in the instant action, is to prove the four factors provided in *Panduit Corp. v. Stahlin Bros. Fibre Works,* 575 F.2d 1152 (6th Cir. 1978) ("*Panduit* Test"). *See Micro Chemical, Inc. v. Lextron, Inc.*, 318 F.3d 1119, 1122 (Fed. Cir. 2003)(stating that "[t]he *Panduit* [Test is a] recognized method[] of showing 'but for' causation" in regard to damages).

If lost profits cannot be proved to a reasonable probability, the patentee may instead pursue reasonable royalties. *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1554 (Fed. Cir. 1995)(citing *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d

1075, 1078 (Fed. Cir. 1983). Reasonable royalties provide the minimum guaranteed damages a patentee may be awarded for infringement. 35 U.S.C. § 284. A reasonable royalty is commonly defined as the amount that would have been agreed upon had there been a hypothetical negotiation, often called a "'willing licensor/willing licensee' negotiation," between a willing patentee and willing potential user "at the time the infringement began." *Rite-Hite Corp.*, 56 F.3d at 1554; *Minco, Inc. v. Combustion Engineering, Inc.*, 95 F.3d 1109, 1119 (Fed. Cir. 1996) (stating that "[t]his hypothetical construct seeks the percentage of sales or profit likely to have induced the hypothetical negotiators to license use of the invention"). Such a determination should not be made in hindsight, but rather courts should only look at what the parties would have considered at the time of the hypothetical negotiation. *Hanson*, 718 F.2d at 1081. To determine the amount of royalties that would have induced the parties to buy or sell a license at the time the infringement began, the Federal Circuit endorses, among other methods, the fifteen factor-approach first set out in *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D. N.Y. 1970) ("*Georgia-Pacific* Test"), which is discussed below. *See Micro Chemical, Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1393 (Fed. Cir. 2003)(stating that "[f]actors relevant in a reasonable royalty determination using [the hypothetical negotiation] method include those set out in *Georgia–Pacific*").

**ANALYSIS**

In their briefs for damages, Mitutoyo and MAC argue that they are entitled to $6,768,302 in Mitutoyo's lost profits through June 30, 2005, and $4,491,801 for MAC's lost profits through June 30, 2005. Mitutoyo and MAC are also seeking $1,021,412 in lost royalties on Central's calipers that are not included in the lost profits amount, calculated at a royalty rate of 29.2 percent. First, Central argues that MAC does not have standing to receive damages in this action because MAC does not have the right to sue for patent infringement. Second, Central argues that lost profits are not appropriate in this case because the Mitutoyo's and MAC's products competed in separate markets from Central's. Finally, Central argues that Mitutoyo is only entitled to a total of $355,190 in damages, based on a royalty rate of 5 percent.

I.  MAC's Standing

The right to sue for patent infringement is provided by statute to the "patentee," who is defined as "not only the patentee to whom the patent was issued but also the successors in title to the patentee." 35 U.S.C. § 281; 35 U.S.C. § 100(d). In order to have standing to sue for patent infringement, one "must have held legal title to the patent at the time of the infringement." *Rite-Hite Corp.*, 56 F.3d at 1551. To convey legal title, a patentee must convey "the entire patent, an undivided part or share of the entire patent, or all rights under the patent in a specified geographical

region of the United States." *Id.* A conveyance of anything less is a "bare" license, which is merely the licensor's promise not to sue. *Intellectual Prop. Dev., Inc. v. TCI Cablevision.*, 248 F.3d 1333, 1345 (Fed. Cir. 2001); *Jim Arnold Corp. v. Hydrotech Systems, Inc.*, 109 F.3d 1567, 1577 (Fed. Cir. 1997)(stating that "[l]icenses are considered as nothing more than a promise by the licensor not to sue the licensee"). The holder of a bare licensee to a patent does not have standing to sue for patent infringement. *Id.*

In some circumstances, however, a licensee may have sufficient interest in the patent to have standing to be a co-plaintiff to the patentee. *Id.* Such a licensee is generally called an "exclusive licensee." To be considered an exclusive licensee, "a party must have received not only the right to practice the invention within a given territory, but also the patentee's express or implied promise that others shall be excluded from practicing the invention within that territory as well." *Rite-Hite Corp.*, 56 F.3d at 1552. It is not the inclusion of the term "exclusive" that gives the licensee standing as co-plaintiff; instead "it is the licensee's beneficial ownership of a right to prevent others from making, using or selling the patented technology that provides the foundation for co-plaintiff standing." *Ortho Pharmaceutical Corp. v. Genetics Institute, Inc.*, 52 F.3d 1026, 1032 (Fed. Cir. 1995). An exclusive license may be created expressly or impliedly. *Anton/Bauer, Inc. v. PAG, Ltd.*, 329 F.3d 1343, 1350 (Fed. Cir. 2003). A patentee has granted an implied license when "(1) the patentee sells an article that has no noninfringing uses and (2) the circumstances

7

of the sale plainly indicate that the grant of a license should be inferred." *Id.* In cases of both allegedly express or implied licenses, the burden of showing standing is on the party seeking to assert standing. *See Fieldturf, Inc. v. Southwest Recreational Indus., Inc.,* 357 F.3d 1266, 1268 (Fed. Cir. 2004).

In the instant action, Central argues that MAC does not have standing because MAC did not have an express license for the '902 patent, and because Mitutoyo "permit[ted] others to import and sell products covered by the '902 Patent." (Resp. 19). Specifically, Central argues that "Mitutoyo Corp. permit[ted] at least General Tool Corp. to import into the United States a Swiss made [sic] digital caliper which uses Mitutoyo Corp. components covered by the '902 Patent." (Resp. 19). Mitutoyo and MAC state in response that "the General Tools calipers are not made by Mitutoyo, [that] General Tools did not have a license under the '902 patent [and that] there is no evidence that [calipers using the components using the '902 patent] were sold in the United States at anytime from May 2002 to the present." (Rep. 18). Mitutoyo and MAC, however, cite no evidence to support these claims. Furthermore, Mitutoyo states in its reply brief that "General Tools simply had the *right* to sell those calipers," which is a direct admission that MAC did not have the exclusive right to sell Mitutoyo calipers. (Rep. 18)(emphasis added). Accordingly, we find that MAC does not have standing to sue Central for the infringement of the '902 patent and, therefore, does not have standing to recover damages in the instant action.

8

Standing is an aspect of subject matter jurisdiction, and therefore goes to a court's ability to hear a case, at least as it relates to certain parties. *See Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 102 (1998)(stating that "[s]tanding to sue is part of the common understanding of what it takes to make a justiciable case"). A court has a duty to consider questions of subject matter jurisdiction whenever the issue is raised. *Id.* at 95. Given our finding that MAC did not have standing to sue Central for patent infringement, we vacate our April 20, 2005, memorandum opinion, to the extent that we granted summary judgment to MAC and we deny MAC's motion for summary judgment on the issues of patent infringement and breach of contract. We also deny MAC's request for damages and dismiss all claims brought by MAC against Central.

II. Lost Profits

Mitutoyo is seeking "the profits [it] would have received from [its] sales of additional units of the patented calipers if Central . . . had not sold the infringing calipers." (Mot. 4). To show that lost profits are appropriate, Mitutoyo argues that each of the *Panduit* factors are met in the instant action. Central argues that Mitutoyo is not entitled to lost profits damages because "Mitutoyo cannot demonstrate by a preponderance of the evidence that there is a reasonable probability that absent the infringement, [Mitutoyo] would have made Central['s] sales." (Resp. 11). Specifically, Central argues that Mitutoyo has not shown that the

infringing calipers and Mitutoyo's calipers "compete in the same market for the same customers." (Resp. 11, 15).

To satisfy the *Panduit* Test, the patentee or an exclusive licensee must establish: "(1) demand for the patented product, (2) absence of acceptable noninfringing substitutes, (3) his manufacturing and marketing capability to exploit the demand, and (4) the amount of the profit he would have made." *Panduit Corp.*, 575 F.2d at 1156. Whether the Mitutoyo calipers and the infringing calipers compete in the same market is important given that "[t]he *Panduit* [T]est . . . operates under an inherent assumption . . . that the patent owner and the infringer sell products sufficiently similar to compete against each other in the same market segment." *BIC Leisure Products, Inc. v. Windsurfing Intern., Inc.*, 1 F.3d 1214, 1218 (Fed. Cir. 1993)(stating also that "[i]f the patentee's and the infringer's products are not substitutes in a competitive market, *Panduit* 's first two factors do not meet the 'but for' test [that is a] prerequisite for lost profits"); *see also Comair Rotron, Inc. v. Nippon Densan Corp.*, 49 F.3d 1535, 1540 (Fed. Cir. 1995)(stating that "if the products are not sufficiently similar--in terms of price, product characteristics, and marketing channels--to compete for the same customers, the infringer's customers will not necessarily transfer their demand to the patentee's product in the absence of the infringing product").

Central argues that there are several differences between the infringing calipers it sold and Mitutoyo's calipers, including the price, physical characteristics,

and retail channels in which the products were sold, which, according to Central, means that the products are sold in different markets. Central contends that its calipers occupied the "low end" of the digital caliper market, while Mitutoyo's calipers occupied the "high end" of the market. (Resp. 15). Mitutoyo argues that the infringing calipers and Mitutoyo's calipers were "sold through the same retail channels to the same customers," that the patented and infringing calipers "were basically the same" from the customer's point of view, and that, in general, Central's two-market theory is "contrary to the evidence". (Rep. 6, 9, 11).

To show that products compete in the same market, a plaintiff must show that "the infringing units do 'not have a disparately higher price than or possess characteristics significantly different from the patented product.'" *Crystal Semiconductor Corp. v. TriTech Microelectronics Intern., Inc.*, 246 F.3d 1336, 1356 (Fed. Cir. 2001)(quoting *BIC Leisure Products*, 1 F.3d at 1219). In *BIC Leisure Products*, the Federal Circuit found that the plaintiff's windsurfing boards did not compete in the same market as the infringing products, given that the products "differed fundamentally" from each other, and that the infringing boards were sold at prices "about 60-80% above [the plaintiff's] selling range." *BIC Leisure Products*, 1 F.3d at 1218. Accordingly, the Federal Circuit held that the plaintiff failed to show, with reasonable probability, that the customers of the infringing boards would have purchased from the plaintiff in proportion with the plaintiff's market share. *Id*.

In the instant action, Mitutoyo does not dispute that the average retail price of

11

the infringing calipers ranged from $19.12 to $48.98, whereas the average retail price of the Mitutoyo calipers ranged from $40.00 to $397.00. (Resp. 6). This means that at the low end, the Mitutoyo calipers were more than 200 percent more expensive than the infringing calipers, and at the high end the Mitutoyo calipers were 800 percent higher than the infringing calipers. The difference in price in the instant action is much higher than the 60 to 80 percent difference in price that led the Federal Circuit to find that there were two markets in *BIC Leisure Products*. *BIC Leisure Products*, 1 F.3d at 1219. This alone is sufficient to show that the infringing calipers were not in the same market as the Mitutoyo calipers. However, there is also a significant physical difference between the parties' products in this case. The Mitutoyo calipers include a data port that is supported by Mitutoyo, whereas the infringing calipers do not have functional data ports and Central does not market them as having this capacity. This physical difference further strengthens Central's argument that the infringing calipers were marketed to hobbyists and "do-it-yourselfers" who, rather than paying a premium price for the more complicated Mitutoyo calipers, "would have either purchased Low End calipers from other discount retailers or they would have not purchased digital calipers at all." (Resp. 2, 17). Accordingly, we find that Mitutoyo has not carried the burden of showing to a reasonable probability that the infringing calipers and Mitutoyo's calipers compete in the same market and, therefore, find that Mitutoyo is not entitled to an award of damages based on lost profits.

III. Reasonable Royalties

In addition to lost profits as damages, Mitutoyo seeks a reasonable royalty of 29.2 percent of Central's sales volume. Central argues that a 5 percent royalty would be sufficient to compensate the plaintiffs for Central's infringement. As stated above, a reasonable royalty in a patent infringement case is commonly defined as the amount that would have been agreed upon, had there been a hypothetical negotiation between a willing patentee and a willing potential user "at the time the infringement began." *Rite-Hite Corp.*, 56 F.3d at 1554; *Minco, Inc. v. Combustion Engineering, Inc.*, 95 F.3d 1109, 1119 (Fed. Cir. 1996) (stating that "[t]his hypothetical construct seeks the percentage of sales or profit likely to have induced the hypothetical negotiators to license use of the invention"). The court should not make this determination in hindsight, but rather the court should only look at what the parties would have likely considered at the time of the hypothetical negotiation. *Hanson*, 718 F.2d at 1081.

Mitutoyo advances a number of reasons to support its claim that the appropriate royalty rate in the instant action is 29.2 percent. First, Mitutoyo's profit margin for the '902 calipers in May 2002, the time of the hypothetical negotiation, was 29.2 percent. Mitutoyo argues that because it was the only exclusive licensee of the '902 patent, it would not have accepted less that 29.2 percent, and in fact did not when other parties approached it about sublicenses. Second, Mitutoyo argues that since Central was selling its infringing calipers at a lower price than the Mitutoyo

13

calipers, Mitutoyo actually would have required a higher royalty rate from Central to break even. Third, Mitutoyo argues that Central's "anticipated gross profit margin for the infringing calipers in May 2002 was 70% . . . ." (Mot. 17). Therefore, Mitutoyo argues that Central would have agreed to pay 29.2 percent in royalties in May 2002. Finally, Mitutoyo cites a number of the factors from the *Georgia-Pacific* test that support its royalty claim, including that the three years remaining on the '902 patent would have been attractive to Central as a way to "get a jump start on its competitors," that the Mitutoyo calipers "are profitable and a commercial success," that the infringing calipers used all of the '902 patent, and that "the profits resulting from the sale of the infringing calipers are due to the patented invention." (Mot. 19-20)(citing *Georgia-Pacific Corp v. United States Plywood Corp.*, 318 F. Supp 1116 (S.D.N.Y. 1970)).

Central advances a number of arguments for why a lower royalty is reasonable in the instant action. First, Central argues that Mitutoyo is attempting to improperly "obtain lost profits damages" by asking for a royalty percentage that is the same as Mitutoyo's profit margin. (Resp. 19). However, as the court in *Georgia-Pacific* noted, it is reasonable to assume that Mitutoyo would not have agreed to a royalty rate that was much less than the profit margin it was making on its own. *Georgia-Pacific Corp.*, 318 F.Supp. at 1127. Second, Central argues that it has paid 5 to 7 percent royalty rates for other "hand tool technologies." (Resp. 26). However, Central does not state any royalty rates that it has paid for caliper

14

products, nor does Central provide any arguments that show that the hand tools it references are sufficiently similar to calipers to be relevant to the instant action. Third, Central correctly argues that, given MAC's and other companies' right to sell the Mitutoyo calipers in the United States, any license granted to Central in May 2002 would have been non-exclusive. Finally, Central also argues that the royalty it would have agreed to pay would have been lower than 29.2 percent given that, as we found above, the infringing calipers were sold in a different market than the Mitutoyo calipers.

Based on all of the arguments presented by the parties, we find that a reasonable royalty in this case is 29.2 percent. While it is true that Mitutoyo would not have given Central an exclusive license for the '902 patent, we find that Mitutoyo has presented sufficient evidence to show that, based on the totality of the circumstances, it would not have accepted less than its profit margin of 29.2 percent. Therefore, we find that Mitutoyo should be awarded a royalty of $2,652,169.00 for Central's infringing sales of the Mitutoyo calipers based on a 29.2 percent royalty calculation. (Rosenthal Sec. Decl. Par. 5).

IV. Treble Damages

Mitutoyo also requests that the court reconsider its April 21, 2005, order finding that Plaintiffs had waived the issue of whether Central wilfully infringed the '902 patent. Mitutoyo has provided no new arguments or evidence in its request that

15

would support the reconsideration of our April 21, 2005, order as it relates to Mitutoyo. Therefore, Mitutoyo's request for treble damages is denied.

V. Breach of Contract Damages

Mitutoyo is also seeking an award of lost profits as damages for Central's breach of contract. In its motion for damages relating to the breach of contract, Mitutoyo uses California law. Central, however, argues that Mitutoyo has not provided any basis for applying California law instead of Illinois contract law, and Mitutoyo has failed to respond in its reply brief to Central's arguments regarding the appropriate law to apply to the breach of contract claim. Therefore, we will apply Illinois law in determining the appropriate damages for Central's breach of contract.

In general, the party seeking damages has "the burden of proving damages to a reasonable degree of certainty" and "[d]amages may not be awarded on the basis of conjecture or speculation." *Telemark Development Group, Inc. v. Mengelt*, 313 F.3d 972, 983 (7th Cir. 2002)(citing Illinois law). In awarding damages for a breach of contract, a court must attempt to "place the nonbreaching party in the position he would have been in had the contract been performed, but not to place him in a better position or provide him with a windfall recovery." *Platinum Technology, Inc. v. Federal Ins. Co.*, 282 F.3d 927, 932 (7th Cir. 2002)(citing *Kohlmeier v. Shelter Ins. Co.*, 525 N.E.2d 94, 102-03 (1988)). However, it is clear that damages cannot "be based on speculation and conjecture." *Id.* at 933; *see also Target Market Pub., Inc.*

*v. ADVO, Inc.*, 136 F.3d 1139, 1145 (7th Cir. 1998)(finding that "Illinois law does not permit an award of damages to put the complaining party in a better position than it would have been in absent the other party's breach").

In the instant action, Mitutoyo is seeking damages based upon its lost profits from Central's sale of the infringing calipers. However, as we found above, Mitutoyo has not shown to a reasonable probability that the Mitutoyo calipers and the infringing calipers competed in the same market. Therefore, any claims that Mitutoyo makes regarding lost profits are entirely speculative. *See U.S. Valves, Inc. v. Dray*, 212 F.3d 1368, 1374 (Fed. Cir. 2000)(citing *Schlosser v. Welk*, 550 N.E.2d 241, 244 (1990)). Accordingly, we find that Mitutoyo has not proven its damages for Central's breach of contract to a reasonable probability. Therefore, we decline to award damages for Mitutoyo's lost profits.

## CONCLUSION

Based on the foregoing reasons, we award Mitutoyo $2,652,169.00 in damages, based on a royalty of 29.2 percent. We deny Mitutoyo's request for damages based on lost profits for Central's patent infringement and for Central's breach of contract. In addition, we vacate our April 20, 2005, memorandum opinion

to the extent that it grants summary judgment to MAC and deny MAC's motion for summary judgment. Finally, we deny MAC's request for damages and dismiss all claims brought against Central by MAC.

                                                _____
                                                Samuel Der-Yeghiayan
                                                United States District Court Judge

Dated:   March 09, 2006